So, our first case on today's docket is the case of Wiggins v. Bonsack. And we have Mr. Matthew Carraway for the appellant. And we have Mr. Patrick Shulkinberger for the appellee. So, Mr. Oh, I'm sorry. Leslie Shiner. Okay, so. And you may proceed, Mr. Carraway. Sorry for the mix up. Just one moment. Mr. Carraway. Sorry, Mr. Carraway. Additionally, if I stand up during your argument, don't be concerned because I just had back surgery. So, sometimes I can't sit. So, pardon me for that. Okay, we're ready to proceed. I have my signing sheet. I know who's who now. Mr. Carraway, you may proceed. Good morning, Your Honors. May it please the Court. I'm here today to appeal a jury verdict that was entered against my client, Tabitha Wiggins, and in favor of the defendant in an automobile crash case. Specifically, I'm here to ask the Court to enter judgment for Tabitha or to grant a new trial. I'd like to take a minute before I jump into the argument to look at the big picture and kind of set the stage for this auto accident. I provided for the Court an overhead view of the intersection, which is on page 6 of my supporting brief. This is a crash that occurred in the heart of West Frankfort, busiest intersection in town. If you're heading for Mount Vernon and West Frankfort on 37, it's the intersection with Main Street and West Frankfort. This is a pretty straightforward auto case in the sense that there were four witnesses. There was the plaintiff, there was the defendant, the responding police officer, and then plaintiff's treating physician, Dr. Kent Heron. I'd like to discuss some of the evidence that plaintiff believes is key to this appeal. First off, plaintiff was traveling south on 37, and she had the right of way. That's undisputed. Defendant had a duty to yield to plaintiff. Defendant was in Padra service station, which would have been to plaintiff's right, getting gas. She had planned to leave Padra service station, turn across traffic, and head back north on 37. The defendant testified at trial that she knows she was partially at fault for pulling out in front and tapping them. She testified that she pulled out into traffic because an unknown man in a red truck waved her out. She said she trusted the man, so she just went out into traffic to proceed and turn. Ultimately, when you look at the defendant's testimony, she believed that the man in the truck was the ultimate cause of this crash, meaning the man in the truck waved her out, so he's at fault. But her testimony was clear that she admitted she was partially at fault, but ultimately she thought that the man in the red truck, who's an unknown individual, was the ultimate cause. I believe defendant's actual testimony, and I quote, was, I think it's the guy in the red truck's fault, really, but that's my personal opinion. The defendant also testified... Yes, ma'am. And at the end of the case, the judge found that that wasn't proper because the defendant had already admitted some fault. Correct. And, in fact, directed a verdict of liability against her. Directed a verdict for negligence. Correct. Finding the defendant negligent. The judge... He made a finding that the defendant was partially negligent. Correct. What I don't understand is why he gave the instruction of over 50% negligent regarding your client. And I don't know why that instruction was given. I, for your honor, it was my argument that the verdict should have been directed on liability, because when you look at the contrived allegations, which I'll discuss with the court, there's absolutely no evidence whatsoever to support that claim that Tabitha was negligent in any way. I believe that the jury should have never been instructed on contrived, and the issue should have went to the jury on whether or not Tabitha was able to establish that she was injured in this crash. If you look... Let's discuss the contrived issue. First off, it's plaintiff's position that there's no evidence whatsoever that the plaintiff was negligent in any way. The only testimony regarding the actual crash was from plaintiff and defendant. There was no other witnesses that testified with the exception of the police officer, who was just a responding officer that came after the fact. But if you look at a defendant's allegations, there are two allegations. One, that Tabitha failed to operate her vehicle to safe speed. Two, that she failed to stop immediately after seeing the man in the red truck wave his hand. And I emphasize the word immediately there, because that was the allegation of the defendant. When you look at the testimony, though, there was absolutely nothing to support that. Tabitha testified that she was approaching the intersection with Main Street. The light was red. There was a vehicle stopped at the light. She's braking as she approaches. She's driving 20 miles or less. The defendant had no estimate to plaintiff's speed whatsoever, because the defendant never even saw a plaintiff's vehicle. In fact, she testified that she didn't even know where the plaintiff came from, because her vision was obstructed by this red truck. So when you look at the record and you try to find where's the evidence to support the fact that plaintiff was driving at unsafe speed or that she was speeding, there is none. In closing argument, the defense counsel made an argument that the jury can imply, since the impact was, quote, hard, that Tabitha was speeding. I don't believe that's proper. And the reason why is if any one of us are driving out here on Main Street in Mount Vernon and, say, the speed limit's 30, we're driving 20 miles per hour and we're driving safely. Someone pulls out in front of us and we hit them. That doesn't mean that we were negligent in any way, but that impact would still be there. Or if you're driving 30. Correct. What it comes down to is if you have two large vehicles that collide, you're going to have a hard impact. I mean, that would be the same if you had a parking lot collision. You're going to have a hard impact. Was there any testimony from anybody about the speed of impact or the amount of force it took to create the damage? There was not. The only ‑‑ well, I'll ‑‑ I mean, the only thing I saw in the transcript was that the defendant claimed that perhaps she wouldn't have been hit as hard if your client was slowing down. But there's no ‑‑ she didn't see that car. So where's the testimony on speed? There is none. The only testimony on speed, Your Honor, is that the client testified that she was breaking. She was going to speed limit or less, probably around 20 miles per hour. I want to backtrack a little bit. Did you object at all to questioning about a fault that was permitted in? Absolutely. I moved for summary judgment before the trial began. And then I moved to try to keep the defendant from arguing that this man in the red truck was a cause of the accident because it was the plaintiff's position that it didn't matter. We knew that the defendant knew that she was a cause, and that's enough to get to the jury as far as the defendant's culpability. Okay. But if you consider this second allegation of contributory negligence where the plaintiff failed to immediately stop after seeing an unknown man wave his hand, not only is there no evidence to support that that was a possibility, but if you take a look at it, it's just a completely unworkable defense. If you put yourself into the plaintiff's car and you're driving down the road and the plaintiff testifies that she's driving as she slows down, she just sees a hand wave from a truck. She doesn't know who this truck driver is. She cannot see the defendant's car. And when she sees the hand wave, she immediately feels a crash. Well, how can a driver of a vehicle that sees a hand flash bring their car to an immediate stop to avoid a collision? I just don't think that's possible, and it's not – and it would be unfair to require the plaintiff to prove that she was reasonable in taking whatever actions to avoid that collision. Mr. Carraway, it was a general verdict, so we don't know how they arrived at it, whether or not it was a CN analysis or no causally related injury. I'm more concerned about the injury argument. Could you address that? Yes, ma'am, I certainly can. With the injury argument, once again, it was a simple case. We had a plaintiff testify about her injuries, and then we had Dr. Kent Heron, a chiropractor from West Frankfort, plaintiff's lone treating physician, testify. A defendant opted to not have a defense medical exam. There was no – they didn't hire a defense expert. So the medical testimony came in, and it was Dr. Heron and Tabitha. Tabitha did not seek formal medical treatment for 87 days after the crash. We know that. We freely admit that. And the defendant in their brief on page 6 argues that the jury clearly rejected Dr. Heron's testimony in its entirety, almost certainly due to the plaintiff's three-month delay in seeking treatment. Or they may never have gotten to that issue because they decided the case rightly or wrongly on CN. Is that correct? Correct. And that's why I believe that judgment should be entered for Tabitha or a bare minimum a new trial because there were two ways that the trial court allowed the jury to reach a verdict here. And we don't know which one there was.  One of the things that was of concern to me is there was a mistrial request made, I think, by the defendant because your client introduced the word insurance. Correct. And I think it was you that said there's a case on this judge where we can introduce insurance to explain why there was a delay in seeking treatment. Am I correct about that? Yes, ma'am, you are. It's the Van Neusten case. Right. And I didn't see where you argued that case in the briefs. The Van Neusten case is right on point. It is, Your Honor. And the reason why I didn't push that issue is that was one I didn't want to get – I didn't expect to elicit testimony about insurance. That was the first time Tabitha had told me that she didn't seek treatment because of a lack of medical insurance. I specifically asked her that in the past, and she had said that she didn't seek medical treatment solely because she thought she would get better. So it's something I did not want to argue to the jury because when she, in fact, treated Dr. Heron, she still didn't have any insurance. So I think that the defense could have really scored some points there, and that's why I didn't press that issue. Okay. But once again, the defendant argues that they just arbitrarily – I'm sorry – just rejected Dr. Heron's testimony because of this three-month gap. Well, assuming that they did that, it's plain exposition that that is a reversible error. I believe it's well established in Illinois that a jury cannot arbitrarily reject uncontroverted testimony. When you look at this case, Tabitha at the time of the crash, 15-year-old high school athlete. She was actually a standout athlete, active, healthy, fit, no prior injuries whatsoever. The crash happens. She develops neck and back pain and difficulty with headaches. This is an active girl that self-medicates by icing, taking over-the-counter medication. Prior to seeing Dr. Heron, she would take rest time out and take naps just to treat these. So, yes, she didn't have formal medical, but a plaintiff's not required to show that they have formal medical treatment to prove that they have a right to compensation for injuries. In fact, they're not required to, in Illinois, to have any medical treatment and they can get compensation for injuries. But I believe this case is very similar to Anderson. I recognize that Anderson was decided in the context of the damages award. But if you look at it, the ultimate holding in Anderson lays out that testimony cannot just be arbitrarily rejected unless it's inherently improbable, unless there's direct adverse testimony. And in this case, there's no direct adverse testimony. They didn't give a defense medical exam, no opposing expert. And it's plaintiff's position that Dr. Heron's testimony was not inherently improbable. Dr. Heron knew the gap, the 87 days before the accident, and he said in his – or between the accident and the medical treatment, Dr. Heron said in his 20 years of treating similar soft tissue injuries that it's common for people to wait two, three, or even six months before they get treatment. Simply put, soft tissue injuries are nagging type injuries that people believe will get better. And if they continue to get worse like Tabitha's, then they seek treatment. Dr. Heron further testified that it is even more common for young people, young athletic people, active people to put off seeking medical treatment. If you look at the Anderson case, the shoulder issue that Dr. Perkins treated and testified, there wasn't a single mention of shoulder pain whatsoever for 10 months. And Dr. Perkins testified that at one point he even testified that the shoulder he thought could have been caused by a viral infection or something, not even an auto accident. And this court still believed that without direct adverse testimony, that that testimony was not inherently improbable. Did Tabitha have any prior complaints or injuries to the areas that she was complaining of after the accident? None whatsoever. And that brings me to kind of my final point on injuries. This was a case where an 87-day gap in treatment. We knew it was going to be an issue. Tabitha had scoliosis, slight scoliosis, which is asymptomatic condition. Dr. Heron testified that the scoliosis was asymptomatic. He did not believe that it was a problem, and he felt, in his opinion, that the scoliosis had nothing to do whatsoever with her current complaints. So I moved in limine at the beginning of trial to keep any mention of the scoliosis from the jury. And Mr. Kurz had one of his partners attend the pretrial hearing the day before. Well, it's my understanding that there may have been some signals crossed on the judge's ruling, but the judge granted my motion. And in opening argument, within the first few minutes, Mr. Kurz has already told the jury that she's had scoliosis and Dr. Heron's seen her pass for it. Well, I saw that Mr. Kurz did that in his cross-examination of your client as well. You were saying something like, well, you've been to this chiropractor four or five times before. Wasn't that in limine out as well? Exactly. I believe it was. So he violated the motion in limine in opening and in the cross-examination of your client? Yes, Your Honor. And why that was so prejudicial in this specific case is you have that 87-day gap in treatment. So from the get-go, in opening argument, you had jurors thinking, well, maybe this young girl had something going on there, that maybe she already had a problem in her back. The issue with that is in Illinois, the jury can't speculate on things like that. The decision has to be based on the evidence. And there was absolutely no medical evidence to show that there was any cause of this healthy girl suffering severe neck and back problems other than this car accident. What took this case so long to get to trial? That's a good question, Your Honor. This case came into the office before I joined the firm, and I do not know why it took so long to get to trial. That's an honest answer. I appreciate that. But overall, if you look at all the facts that involve regarding Tabitha's injuries, 15-year-old active girl gets in a car accident, and then her life changes to where she can't be as active. She has problems with her neck and back. She's limited in her sports, but she continues to play. She has issues when she plays volleyball. She treats with the chiropractor approximately 70 times. She's a cute young girl. She wears a big back brace over her clothing to school as a 15-year-old in high school. That means it's just overwhelming that she was injured. There's nothing to suggest that Tabitha… You can complete your thought, and then you'll have the opportunity for rebuttal. There's nothing to suggest that Tabitha was injured in anything but this car accident. We'll have the opportunity for rebuttal. Mr. Taylor, thank you. Thank you. Mr. Kurtz. May I please report? Good morning. Good morning. My name is Mark Kurtz, and on behalf of the defendant, the appellee in this case, Ms. Bonsnett, we are here to argue that the trial court did not commit any rigorous lawyer in this case. The trial court properly denied the post-trial motion seeking JNRB and seeking a new trial. Now, Judge, you heard a lot of argument today about contributory negligence, and it may have been that the jury decided the case on contributory negligence, but I think the more likely decision of this jury was based on approximate cause. Well, we don't know that, do we? So why don't you tell me why you think C.N. instruction was proper? Because of the evidence, Your Honor. Obviously, in this case, as the appellee trial judge is entitled to every inference, the defendant is entitled to every inference, and to view the evidence in the light most favorable to the defendant, as you well know. On the issue of contributory negligence, the testimony was clear. Yes, the verdict had been directed against my client on the issue of negligence, but that didn't take out Ms. Wiggins' own comment, and the testimony was this. Both individuals saw this unknown truck driver waving out, and what's key is what the plaintiff said. I understood that motion to be a come-on-out motion. We've all seen it in our own driving habits. When you see a come-on-out motion, it means somebody's coming, and this lady, the testimony's in the record, did not stop, didn't hit the brakes hard, didn't do anything to slow down. She was already in the slowing process. As I recall, what I read in the briefs was that it was almost instantaneous when she saw this man wave, and she wasn't sure why because she didn't see any car, and when she got hit. But that defies logic because she may have said that, but if there's a wave out and my lady's in the parking lot, it would have taken her time, and she testified she came out very slowly to cross in front of this first vehicle, and the impact occurs with the plaintiff's vehicle. But your client testified that she didn't see the plaintiff either. I agree. So how is it that you expect the plaintiff to see your car when your driver couldn't see the plaintiff? I agree, Your Honor. And wasn't your client's car hit at the wheel? I mean, she wasn't hit at the front of the car, at the headlight. She was already into the lane, and it happened instantaneously. I agree with you, Your Honor. It did occur about that point. So your client, did she ever testify that she was creeping slowly so she could look around? I didn't see that. She testified that she came out slowly and was looking in that direction. But couldn't see the oncoming car. Right. So where is the more than 50% contributory negligence? I'd like to have you tell me the direct evidence. The direct evidence, as I understand it, and the court's ruling on this, was the wave out motion. The plaintiff didn't see my lady, but she saw the motion, which tells you, hey, there's a car or a vehicle coming. That is enough, maybe in the jury's mind. Why does that tell you that? Why couldn't the person still be sitting in the drive? Because many times people wave you out, and the person in that driveway will go, no, I think I'll wait. Right, but the plaintiff recognized that motion to be a comment on the motion. Sure. And took the chance. If you see that motion. Who took the chance, your client or the plaintiff? I don't contend that my client is 100% free of negligence here, Your Honor. She did come out slowly, but she was reliant. She thought that this driver was telling her, hey, it's safe to come out. But you're talking now about over 50% negligence on the part of the plaintiff to get a verdict for your client. I realize that. I'm just wondering, is that the only thing that you can argue from a direct point of view? From a direct point of view, in fact, there's a wave. She never hit the brakes harder, never slow, other than the natural process of approaching the stop. The plaintiff testified to that. How is it that your client's allowed to testify legally as to the cause of the accident? The question from? The legal cause of the accident. That was a question from the plaintiff's counsel, not from me. I didn't ask her the cause of the accident. I was over it. I believe I objected at the time, at least in pre-trial proceedings, to that very issue. I don't believe it. Well, I realize that a lay witness can testify as to an ultimate opinion, but I don't believe it was proper in this case because she doesn't know the speed of the plaintiff's vehicle. Couldn't have known. And neither, the same is true of the plaintiff. But you argued in closing argument about the speed and the force because you told the jury that it had to be, she had to be going pretty fast or you wouldn't have gotten the kind of impact that you saw on your client's car. Because the plaintiff said. Where was the evidence of that? The plaintiff herself said that the impact was hard. But where's the evidence of speed? You had no expert. No, I did not have an expert on this case. It wasn't a case that we felt worthy of an expert on that issue. And yet you argued it as though it was evidence. I think it was a proper inference that an attorney can make from the evidence in the record. It's obviously not evidence what I argued, but it is proper argument, closing argument, at least in my position, to make the assumption, to tell the jury that the impact was hard based upon the plaintiff's stated speed. And the fact the plaintiff indicated she had not slowed. Now, on the issue, if I may, if you have any more questions, I can certainly talk about it. But I think this case was ultimately decided on the issue of proximate cause. But we don't know that. That's the big question mark when you have a general verdict. It is. And you perhaps have an improper instruction. I don't believe it was improper, but I do think based upon the evidence and the argument, I think the jury decided this on that gap in truth. I'm fairly certain that's it, but that's just my opinion. We'll never know for sure. I agree with that. That's the problem with the general verdict, but that's the proper verdict form to be utilized in this case. I'm not aware of another one that would assist us. Now, on the issue of this Harrison case, the plaintiff is right about the law. This court decided the law that you can't reject a doctor's testimony. A direct testimony can be rejected if there's testimony that contradicts it, that's inconsistent with it. Anderson, in my view, was decided rightly, but very narrowly. The facts here don't fit. The law has been. What testimony did you offer to contradict the opinion given by the chiropractor? The following, Your Honor. I believe there are at least six discrepancies that allowed a jury. Not discrepancies. I'm asking you what evidence did the defendant put on? Through the plaintiff. All the evidence came through the plaintiff. Well, the plaintiff can't dispute a medical expert, can she? Agreed. And from the very beginning of this trial, you're, it seems like anyway, your defense was this gap in treatment. Yes. And you violated the motion eliminating an opening, you violated it on cross-examination, and you violated it at closing, right? Well, no. I only think I violated an opening. It wasn't objected to later, and I don't think that was the ruling. Well, if you have a motion eliminate and you've been told by the court you violated an opening, why is it that the very second or third question to the plaintiff was the violation of a motion eliminating? I don't understand that. Your Honor, the motion eliminating, I believe, was this lady had prior scoliosis. I clearly violated that due to miscommunication. I'm good for that. I understand that. You violated several motions eliminating. No, the next question, the question that you're talking about was did you treat with Dr. Aaron? That was not eliminate. Eliminate was scoliosis. But even if I did violate it, an objection wasn't raised, and the only remedy is a mistrial. Did she only treat with him for scoliosis? Pardon me? Did she only treat with him for scoliosis? As I understand it, yes. So isn't that really an unfair question? Because what you're trying to plant in the jury's mind is that she treated him for some other injury or illness or disability, and as we know, the only one that that could have been was the scoliosis, which has been violated, which was eliminate. Well, that's true if that is the exact wording of the court. The court instructed me not to mention scoliosis, and I did. But the point of the motion eliminate, Your Honor, it's one-letter court of law. The court admonished me. It told the jury to disregard, and if it was too prejudicial, a motion for mistrial is the only remedy. I don't believe it's before this court at this point because the motion to mistrial the case wasn't made. And without that motion, it's not before this court. It wasn't an intentional violation on my part. What were you hoping to gain from that question, then? The fact that she had access to a doctor, someone she had treated for in the past, and yet when she's in a car accident, she chooses not to see the guy who's two blocks from the house. And you made that very clear to the jury, someone she has treated with in the past, as if to say, there's something back there, ladies and gentlemen, but you don't get to know what it is. I understand you can take it that way, but when I was driving you, you could take it this way. Hey, I've been in a car accident. I've hurt my back. Do I know somebody that can help me for that? Yes, I have a chiropractor I have seen for many years in the past. Who you claim was not a real doctor. Pardon me? You disparaged his reputation by claiming he wasn't a real doctor. Well, it's true. And yet somehow he was lying to the jury. Not lying, just embellishing.  I agree with that, Your Honor. But, and I think a lot of people share that view, quite honestly. If I may. You also indicated, Mr. Kurz, and this was a violation of the motion to eliminate, that the other passengers weren't hurt. As if to say, hey, if her mother sitting in the front seat wasn't hurt, how could she be hurt? Why would you do that? Your Honor, as counsel indicated to you, because of another commitment I had that day, I wasn't at the pretrial. My partner gave me a list of motions to eliminate, and that one wasn't communicated. That's my fault. Was that a motion that was in writing that you reviewed? It was a motion in writing, and I didn't know the judge was ruling on it. So you took a chance. You didn't check it out before you started into the topic. Well, I thought, he actually told me that the motion was denied. He was mistaken. But, you know, once the horse is out of the barn, it's hard to put it back in. So you've got passengers weren't hurt. You've got this lady saw the chiropractor on several occasions before this, and yet you're arguing that she's feigning or malingering. And I think that's exactly what, not malingering. I mean, but that was your case. I mean, you said the bulk of your case was this injury. You put that in the record. Absolutely. And then you violate the motions in limine to get that. First of all, as I said, it wasn't intentional. But even regardless, that doesn't make a difference as to my intention. What matters is the preservation of the record. What matters, I think, is the prejudice to the plaintiff. And if there was prejudice, Your Honor, I don't believe there was, but if there was, then move for a misdraft. I've moved for hundreds of misdrafts. I have motions violated against me. Move for one in here. And I moved for one in there, as you indicated. And I lost that one. But I think that's the way you have to preserve the record. That's what I've always been taught and what I've always done. If you want to hear an argument, I'd like to talk a little bit about this, the Anderson case, which I was talking about. I think you wanted direct evidence on medical testimony. It's true I didn't put forth a document. But I don't think it's the policy of this Court to require defendants to have an eye on me in every case. There's tactical decisions we make. You are correct about that. You have to have some credible evidence from somebody or some factual basis that was relied on, that was incorrect, to overcome the evidence of a credible, reputable doctor. Agreed. And that's where I cite to you folks the Moran case from the 2nd District, wherein a plaintiff's testimony was deemed not credible. And the judge in that case felt that you can contradict direct testimony with contradictory evidence. So it doesn't add up. It doesn't make sense. And we have that here. The 87-day gap of treatment is gigantic here. It's the issue in the case that I think was decided. But even if it didn't, it wasn't enough. She reported no injury to my client at the scene of the accident. She reported no injury to the police officer. She denied medical treatment there. She didn't seek any medical treatment for that length of time. She didn't obtain any medications. And she continued to engage in a very high level of athletics. That's laudable on her part, but it doesn't support the fact that she was hurt. But didn't the doctor explain all that as far as it being a very common occurrence, especially in young individuals and active individuals? So what we're really getting back to is the credibility of the doctor. Not her, the credibility of the doctor. I believe the doctor attempted to distinguish that. He offered the first time I've ever heard a chiropractor or any doctor say it takes about three months or more for whiplash symptoms to manifest. That simply is not what typically happens in these cases. And I think the jury understands that. Whiplash symptoms come on quickly, and I think the jury came to that conclusion based upon medical evidence in front of them. Had the explanation of lack of funds been introduced, which you objected to highly, despite the Fifth District case to the contrary, do you think the jury would have changed its mind? I mean, now they would have been explained why she didn't get medical treatment. She had no money. We'll never know that answer. And it's potentially possible, Your Honor. I did object to it for tactical reasons. You objected to it despite the case out of our district that says otherwise. I understand that, Your Honor. And the judge went along with you. The judge agreed with me. Do you think the judge committed error on that point? I think he had the discretion under the case, as I understand it, to keep that evidence out because he was very cognizant of the issue of insurance, the implication it gives to a jury. I'm well aware of your holding in that case, Your Honor, but I think that the judge decided that it should stay out of this case. Did he commit error? I don't believe he did. But I also don't think it's before this Court. Again, I realize you can review anything you like, Your Honor, but I don't think it was brief in any fashion in this case. Well, don't you think it's all the questions that we've been peppering you with. Don't you think that's included in the issue of manifest way to the evidence? It is. It is. I agree with you. And that's one of the issues here. It most definitely is. It's our position, though, that if the standards and the burden upon the plaintiff being as high as they are, asking for both JLMB or a new trial, the evidence is not sufficient. Clearly, the jury had a right and a basis for coming to the conclusion it did. It had the right to reject the testimony of the doctor. Anderson is a distorted court based upon the conduct of the plaintiff herself and those other circumstances that the jury could sit. Had she simply gone to see the doctor sooner or even complained of pain sooner, it would have made a difference. The jury didn't hear that testimony, and I think the jury returned the verdict accordingly. I'll never know that for sure, but that is my opinion as to what the jury came to. Unless the Court has any further questions, that's all I have. I don't think so. Thank you, Mr. Kurtz, for your brief and testifying argument. Mr. Carraway, do you have rebuttal? Yes, I do, Your Honor. I'll read. Your Honor, I'd like to briefly discuss something Anderson had just pointed out. This court in Anderson highlighted the fact that the Dr. Perkins who testified in regards to the shoulder injury, his testimony was key in explaining how somebody could wait 10 months before they made complaints of a specific injury. And how he did that is he said, at times people can have injuries to their neck. They treat their neck and then the symptom manifests in the shoulder. This court emphasized the fact that once the doctor had testified that it was in the record, the defendant needed direct testimony to contradict that, and they didn't have any. That's the same thing here. Yes, there's an 87-day gap. Tabitha didn't get treatment for 87 days after the crash, but Dr. Heron testified in regards to that gap. And his testimony was unwavering, and there was very little actual cross-examination of Dr. Heron. I want to jump over to the contrib issue and this idea of how a jury could have possibly found Tabitha was more than 50% liable. I think the best way to look at that issue is to look at it through the lens of, one, the defendant already admitted that they were partially at fault, so there's some percentage. And then ultimately they testify that, well, now, is the guy in the red truck? He was ultimately at fault. Well, if you have a guy in a red truck that's completely at fault and you think you're also additionally shares some fault, there's just no way a jury can come to a verdict based on the fact that Tabitha was 50% at fault or greater. And I want to briefly discuss also this idea of Tabitha should have came to an immediate stop because she saw an arm wave. To me, I think Mr. Kurz may have taken some steps with how the testimony actually came out. You have the record in front of you. But if you see a hand flash, a person you don't know, and immediately you're in a crash, there's just no way you can slam on your brakes. And if you were to slam on your brakes simply because you saw somebody wave their hand, I would submit that that would be negligent. Keep in mind, we're at rush hour traffic. If West Rancor has rush hour traffic, we are right after school is out in the heart of town. Tabitha, if she would have saw that hand flash and just slammed on her brakes, she likely would have caused a crash. And then when you further look at the defendant's testimony and the defendant even admits, I'm not sure, but if Tabitha wasn't going as fast, she might not have hit me as hard. That's very important because her own testimony is saying this crash was going to happen because of what she did, the decision the defendant did, when she decided to pull out in front of oncoming traffic. All in all, it would be patently unfair to Tabitha if she was denied a judgment in her favor or a new trial in light of the evidence at trial and the fact that Mr. Pers chose not to attend the pre-trial hearing and he had communication issues with his partner. That's something that is Mr. Pers' responsibility. Tabitha shouldn't bear the results of his failures there. So at the end of the day, Your Honors, I ask for judgment to be entered for Tabitha to bear a new trial. Thanks for your time. Thank you. Thank you. Both gentlemen here briefed in argument, so we will take them under advisement and under rule in court.